Luz Milagros CRESPO
VARGAS, Plaintiff

v.

UNITED STATES GOVERNMENT,
et al., Defendants.

Civil No. 03–1736 (ADC)(JA).

United States District Court,
D. Puerto Rico.

Aug. 18, 2008.

Juan Ramon Rodriguez–Lopez, Rodriguez Lopez Law Office, Ponce, PR, for Plaintiff.

Ginette L. Milanes, Isabel Munoz–Acosta, Miguel A. Fernandez–Torres, United States Attorney's Office, San Juan, PR, for Defendants.

## OPINION AND ORDER

JUSTO ARENAS, United States Chief Magistrate Judge.

Plaintiff initiated this action on July 7, 2003, and a third-amended complaint was filed on May 24, 2006. (Docket No. 54.) Jurisdiction was based upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 42 U.S.C. § 1983.

Plaintiff was hired as a District Adjudication Officer (GS–801–05) by the Immigration and Naturalization Service ("INS") on March 15, 1998. (Docket No. 54, at 2, ¶¶ 9, 11.) She alleges that she was the victim of discrimination against her based on religion, sex, and reprisal or retaliation, resulting in her termination from employment with the Immigration and Naturalization Service on February 23, 1999. (Docket No. 54, at 2, ¶ 9.) She also claims that she was discriminated against in being treated differently from similarly-situated individuals outside of her protected group. (Docket No. 54, at 3, ¶ 13a.)

The action was tried to the court on March 3, 4, 5, 6 and 7, 2008. Based upon the evidence presented at trial, I make the following

### FINDINGS OF FACT

1. Plaintiff Luz Milagros Crespo Vargas ("Ms.Crespo") graduated from the University of Puerto Rico, Mayagüez Campus, in 1977 and received a degree in accounting. She was married in 1978 and moved to the San Juan metropolitan area. She then obtained employment with the Insurance Commissioner of the Department of the Treasury where she worked for a year and a half and then resigned.

2. Plaintiff raised her daughter, and when she was a high school senior, plaintiff decided to go back to work

and get a job where she could retire after twenty years. In 1997, she got a job as a librarian/teacher for the Department of Education.

3. Subsequently, plaintiff read a newspaper ad regarding employment with the INS, and answered the ad. She took an examination, scoring 94, went through the employment process and was offered a position.

4. Plaintiff was offered and declined the position of Immigration Inspector because she did not want to work overtime.

5. When she joined the INS, her purpose was to retire after 20 years.

6. Plaintiff qualified as an INS District Adjudication Officer. On March 15 or 16, 1998, she began working with the INS.

7. On plaintiff's first day at work, thus beginning her one year probationary period, she went to the office of Mr. Robert J. Bowles who was the Assistant District Director for Examinations of the INS, and the highest ranking authority in the division. Joseph Shassetz, the person who would be plaintiff's direct, or first-line supervisor, was not present at Mr. Bowles' office on that occasion. Mr. Bowles would be plaintiff's second-line supervisor.

8. Another employee, Iván Ortiz, who is at present possibly the Public Affairs Officer, began working on that same day and was present in the office. Mr. Bowles welcomed plaintiff and Mr. Ortiz and explained the work to both of them.

9. Mr. Bowles did not give general guidance on that day but explained the job, which entailed interviews with people seeking residence status. Mr. Bowles related a situation that plaintiff might encounter, and

would make her uncomfortable. The manner in which Mr. Bowles related the situation made plaintiff feel bad at that time.

10. Plaintiff would work with immigrants who wanted to be naturalized. Mr. Bowles explained a situation, going into a graphic description, which applicants provide in order to prove that their marriage was a true marriage, for love, and not for the purpose of receiving benefits by one partner marrying a United States citizen. One way to evaluate this is that the officers asked questions of the applicants separately, first to the man then to the woman, and then the officer would compare their answers, for example, what hour they got up in the morning, or at what hour they would sleep in the afternoon or evening.

11. Mr. Bowles told plaintiff that once a young woman came in with an older man, and they showed Mr. Bowles a picture of them. In the picture, the couple was naked in the bed and Mr. Bowles went into the details of the picture. Mr. Bowles asked the couple if it was taken before or after. As he related the story to plaintiff, Mr. Bowles was sitting in his chair, giving a graphic description, and lifting his hands up and down, gesticulating before or after and saying, "you know ... you know", and he was laughing at that time. He did not say before or after what. Plaintiff's interpretation was and is that the couple's picture was taken before or after sexual relations. Mr. Bowles never showed her any such photograph. Plaintiff was uncomfortable, and felt it unnecessary to

get into that detail. She did not laugh and did not find that to be funny. While plaintiff did not tell Mr. Bowles that the discussion made her uncomfortable, he stopped there and did not continue.

12. For each of the following three days, Mr. Bowles would come to plaintiff's work space or call her into his office, give her no work to perform, and talk to her about the work, also going into personal matters, shifting to things that have nothing to do with the job. Plaintiff made a mental note that she would forego with familiarity. She did not want to be familiar.

13. Plaintiff worked in the Examinations Division of INS, then located on the third floor of the Federal Building. The office was subdivided into officers and clerical staff. In her position there were another six people hired. There were also other people but plaintiff did not know what their positions were. She saw them, worked with them, and had meetings with them. There were a total of two females and five males.

14. When Mr. Shassetz returned to the division, he assigned plaintiff to work with employment authorization cards. Mr. Shassetz said that she would be sitting in the clerical area, where fingerprinting was done. Mr. Bowles constantly went to the clerical area, speaking with other co-workers in a very familiar way. Plaintiff was very professional with him. She did not want to know about his family, and concentrated on her job.

15. Plaintiff received training at Glynco, Georgia, in April 1998 until the beginning of May, five to six weeks, and received a high grade 90, which was completely successful.

16. One day, Mr. Shassetz told plaintiff that she was going to be working as duty officer. At a meeting one or two days before, a co-worker had stated she did not like duty because it was a time-consuming task. Mr. Bowles had said that the duty should be done by an experienced journeyman, a grade 12. Plaintiff was a grade 5 at the time. In the division, there were six employees at grade 12. There may have been one at grade 11.

17. On May 31, 1998, Mr. Shassetz assigned plaintiff to perform the duties of duty officer. Plaintiff did not know what to do. This was her probationary year. The others were permanent employees, and they were also District Adjudication Officers. Other employees agreed that the job of duty officer was a time consuming task. Mr. Bowles had said that overtime would be authorized for the duty officer.

18. On her first day as duty officer, plaintiff was given a sign up sheet, and was put in charge of the rover program, which included picking up assignments. She was duty officer for two or three days. According to plaintiff, nobody explained the duties of a duty officer, and she was upset because she did not know what to do. The duty officer days were always objectionable but she never received a reprimand or disciplinary action after any time she served as a duty officer, which duties were part of being a DAO. People were putting papers in the box all day and she did not ask anyone what they were or what

they were for. She was given papers but did not know she was supposed to check the status of applicants. Mr. Soto came to her at the end of the day and told her what to do but took the papers with him.

19. Plaintiff's duty hours were from 7:30 A.M. to 4:00 P.M. People came in for appointments to inquire about the status of their applications, and the duty officer had to check to see what was happening. One day, Maritza Soto, the information supervisor, checked with her regarding some papers, telling plaintiff that there were other applicants in the waiting room. Plaintiff did not know that each paper represented a person waiting in the waiting room. In addition, plaintiff was working with the employment authorization cards, so Martiza Soto said she would take care of this, took the papers and left.

20. Mr. Shassetz assigned her to an area where there was a camera to take pictures of the applicants for the issuing of a card, and to fingerprint the applicants. There was also a computer and file cabinet containing files of those applicants.

21. During the year plaintiff was at the agency, another District Adjudication Officer, Teresa González, was hired at her same level, GS–5, and three months later, another one, Sally Ann Divornik, was also hired at GS–5. Plaintiff had last seen her when terminated, and then saw her in the courtroom. Both Ms. Divornik and Ms. González had the same supervisors. Ms. Crespo noted that Ms. Divornik once had received a verbal reprimand during plaintiff's probationary period.

Neither had been assigned a cubicle right away.

22. Plaintiff found that there was excessive familiarity in the work environment. Everyone talked and chatted about TV shows and the newspapers, and the conversations turned to things happening outside the office. Plaintiff herself would greet fellow employees and continue walking or would walk away. She had a good relationship with her co-workers because she felt she could provide support for them and pray for them. Prayers took place at the workplace, in private, during work hours but in break times.

23. At work, Mr. Bowles would talk about family matters and his family life. Mr. Bowles had been born in Aguadilla and was abandoned by his father as a little boy. He talked about his religion (Catholic), and being a marriage counselor, like a catechist, at his church. He joined the Army or Navy. He related activities that he would do with his daughters, like changing a flat tire.

24. Plaintiff's co-workers would share a newspaper showing a lady scantily clad in something like a bikini on the centerfold. The title was El Bonbón de la Semana. Plaintiff did not remember if the newspaper might have been Primera Hora. The bikinis were very small, like strings. She did not remember if one person brought the newspapers or if there were many. Plaintiff recalled more than two centerfolds posted in someone's office but did not recall whose office. The co-workers showed them to each other, and talked about giving a show, like the girls might be on the No

Te Duermas Show. The co-workers also discussed the show, which she believed was on Channel 2, a local channel, or the Telemundo channel. Plaintiff noted that the No Te Duermas show came on right after the news. Planitiff could not remember a specific person but this was a topic of conversation among the employees there. If plaintiff did not want to hear these conversations, she would walk away to her work area. Plaintiff could not state an exact number but this happened frequently and there was not always the same amount of people and it did not happen all the time. People from another division would also come in to chat and talk about what happened on the show the night before. There were many divisions on the same floor, and many offices in the same hall. The people present enjoyed taking part in the conversation, and the subject did not bother them.

25. As to the familiarity in the work environment, people would touch, although she herself would not touch. There were conversations about sexuality, and improper jokes. The bad and improper jokes related to bodily functions, and sexuality. For example Martín García would talk to people and touch their arm. The touching was not sexual in any way. That was the way he talked to people and did that to everybody. Plaintiff never told him in so many words that the touching bothered her, although, before her termination, she reported that she was uncomfortable with his touching. This occurred in a November 12 memo to Mr. Shassetz.

26. Plaintiff recalled an incident where Mr. Bowles danced with an employee, an older lady, in a work area, during duty hours. He touched her, and they danced around the work area. Plaintiff found this to be improper. Mr. Bowles had greeted the lady, and she stood up, they hugged, and they danced. This was the only time she saw this, that is, his dancing with a co-worker. The incident lasted less than a minute. Plaintiff could not recall specifically who was present.

27. Among the familiar co-workers and supervisors were Andrés Rivera, Martínez García, Mr. Vélez, Mr. Carlo, Iliana Aguilar, Mr. Shassetz, Mr. Bowles, and Ms. Martínez, the last three supervisors. Also familiar were the GS-5s that began after her, Ms. Divornik and Ms. González, and sometimes people from other divisions.

28. On one occasion, Mr. Bowles was speaking with a dark-skinned female in the clerical area when plaintiff entered that area. She was probably younger than plaintiff who was 44 at the time. There were sexual connotations in the conversation. There was another person present, Rosa Rivera, who is in charge of time and attendance. Plaintiff walked away. The younger woman noticed that plaintiff did not like the conversation.

29. There were bad jokes told, although plaintiff did not remember the names of persons present when these bad jokes were told.

30. Almost everyone in the division interacted with each other with familiarity. They discussed personal matters, as though they were family, as though they were more than co-workers. According to plaintiff,

there was too much "confianza" (presumptuousness).

31. Plaintiff considered that she performed well in the 11 ½ months at the agency, and understood that she was at least fully successful.

32. On November 10, 1998, Ms. Crespo received a memo from Mr. Shassetz signed by him as Supervisor District Adjudications Officer, the subject being professional responsibility. (Exhibit E.) When she was given the memo, she first refused to sign it when requested. She then wrote at the bottom of page one of the two-page memo: "At 4:20 p.m. before reading this memo, I was ordered to received it and signed it." Signed Luz Crespo. Her hand-written statement continues: "I can't assure that this memo I am signing is the same one I am receiving."

33. The memo contained professional criticisms, including her refusal to work overtime and an incident regarding a confrontation with Ms. Martínez. Mr. Shassetz told plaintiff that she could make a response to the memo.

34. Plaintiff replied to the memo on November 12, 1998, addressing the November 10 memo point by point, and basically describing that she had not done anything wrong. (Exhibit A.) The memo from Mr. Shassetz related that two applicants had been left without assistance the day before. Plaintiff had gone home while people were still there. Also, it said that she had a confrontational attitude and she had a situation with Ms. Aguilar and Ms. Martínez. Plaintiff responded that she was working with the employment cards on that day and she had made 37 or 39 cards.

At one point, plaintiff had gone to the information section and asked that no more applicants be accepted for that day. The information section is where applicants request services before they proceed to see the officers. Once plaintiff receives information, she has to write it in the computer, and on the card. She had just enough time to make the cards and give them to the waiting applicants. On the date in question, it was after 1600 (4:00 P.M.) and other officers had gone home. While officers offered to help, there was only one machine. On the next day, Mr. Shassetz gave her a memo and said that she had left two applicants without being served.

35. Also mentioned in the memo was an incident concerning Mr. Shassetz and his assigning plaintiff to Ms. Aguilar's cubicle to work; Ms. Aguilar did not like that. In the cubicle there were two chairs. There were files on one chair. Plaintiff put the files on the file cabinet, and at the end of the day, Ms. Crespo forgot to put the files back on the chair. Plaintiff had even swept the floor before leaving. On the following day, Ms. Aguilar knew someone had used her office because some of her files had been moved. Plaintiff had moved her files and had not moved them back. Ms. Aguilar asked who had used her office and said that plaintiff had placed her files in disorder. Ms. Aguilar also said that nobody respected her because she was black. Then Mr. Shassetz told Ms. Aguilar to calm down. Plaintiff went to the back room and cried. Mr. Shassetz counseled plaintiff because she made trouble in the office with a

co-worker. Plaintiff said it was not fair, because plaintiff had no control over what Ms. Aguilar said or did. Mr. Shassetz said "Look, you both were involved." She insisted that she had no fault in the incident.

36. A situation occurred with Ms. Martínez, who made appointments for fingerprinting applicants. Ms. Martínez handed plaintiff a file and told plaintiff to make the appointments and to return the file to her. Ms. Martínez said never to leave anything on her desk if she is not present. At the end of the shift, Ms. Martínez was not there so plaintiff kept the file. Ms. Martínez asked for her file the next day. Plaintiff explained to her that she, Ms. Martínez, was not in the office (the day before). Ms. Martínez went to the place where the file was, and returned, saying that she was still looking for the file and that plaintiff had lost it. Ms. Martínez then asked plaintiff for the list of applicants and plaintiff showed her the list. Ms. Martínez returned at the end of the day and there was an applicant waiting all day in the waiting room, but Ms. Martínez had the file in her hand. Ten minutes later, Mr. Shassetz told plaintiff to come to his office. He said that there was a problem with the applicants because she did not work overtime, that they went unattended, and that every officer had a complaint because she was different or apart.

37. In her reply memo, she stated that she did not enjoy the environment of the office, or sharing a joke, with sexual connotations, or touching. Plaintiff did not express that in words directly, but believed that she let them know by walking away, and believed she was different in that way.

38. Mr. Shassetz said that there were attendance and confrontation problems with co-workers. Plaintiff explained the two situations in her memo. Plaintiff's reply was that she was not accepting the explanation.

39. Plaintiff worked overtime many times, and said she never refused to work overtime. Sometimes she got paid and sometimes she did not get paid. Mr. Shassetz said there was no money to pay for the overtime. In response to an incident which occurred on October 28, 1997 with a supervisory applications clerk, plaintiff remembered that she was not allowed to leave the office on time, and when Mr. Shassetz was asked by her if she was going to be compensated, he said, "No", because overtime must be approved in advance. She then wrote that he used his power as supervisor to retain her at work, in her personal time and without compensation.

40. At page 5 of her memo, plaintiff wrote, "I want you to stop the improper pressure on me, and to stop treating me with disrespect. . . ."

41. Plaintiff considered that her response of November 12 was respectful and neither confrontational nor argumentative.

42. One day, when Mr. Shassetz was not present, Mr. Bowles called her into his office. He spoke about work and personal matters. He never asked her about her religion or her family. He never asked her about her social life, not in questions. He never asked her anything that "crossed the line." Mr.

Bowles spoke to all of the employees in a personal tone. She never objected to him. However, she reported on November 12, about the familiarity in the office in general to Mr. Shassetz, but did not refer to Mr. Bowles in specific. She never complained to anyone about his behavior in particular. Familiarity existed from day one. It did not evolve.

43. Plaintiff was terminated on February 23, 1999. Mr. Bowles called her to his office and gave her a termination letter which was signed by Ms. Dorothy C. Swartwood, Personnel Officer for INS. (Exhibit F.) Plaintiff asked him why. While he said she was intelligent and capable, he also said that there were complaints · from her supervisor. Mr. Shassetz was present. Plaintiff inquired of Mr. Shassetz regarding the termination. Mr. Shassetz did not say anything. The letter gave as reasons for termination her repeatedly challenging authority and not accepting constructive criticism. After being discharged, plaintiff got very sick that day and went to the infirmary.

44. Plaintiff requested a meeting with Ms. Myrna Peré who was the district director, and therefore the higher authority over Mr. Bowles.

45. Plaintiff had a meeting with Ms. Peré a week later. She brought a letter to Ms. Peré for her to give to Mr. Swartwood but Ms. Peré said they would not read that long letter. Ms. Peré said that it was her word against Mr. Shassetz and Mr. Bowles. Ms. Peré also said that the memo she wrote to Mr. Shassetz "sunk her" and that they did not want to work with her anymore. Plaintiff had sent Mr. Shassetz the memo, with a copy to Ms. Peré, before she was terminated. Ms. Peré did not read the Swartwood letter in front of plaintiff, but flipped over the pages. Plaintiff did not know if she read the memo or not. Plaintiff considered the document an answer to the termination letter.

46. Ms. Peré said she would contact plaintiff. When Ms. Peré did contact plaintiff on the phone, she said that the decision was not to reconsider the decision.

47. Plaintiff then said that she would go to the Equal Employment Opportunity Commission ("EEOC"). She called the EEOC and said that she wanted to make a complaint with the Commission precisely because she was terminated for complaining.

48. Plaintiff's dismissal letter from Ms. Swartwood said she has 45 days to consult an EEO counselor. Plaintiff noted that she wrote to the EEO several times and sometimes the EEO asked for acknowledgment of documents. The formal complaint was made on the 45th day. Plaintiff sent the complaint to the INS Office of Equal Employment Opportunity. She formally reported discrimination to the agency on July 15, 1999. (Exhibit 1.)

49. On March 23, 2001, plaintiff wrote a contrite letter of apology to Diane Deaver, Director of EEO office for INS. (Exhibit C.) She asks for forgiveness, noting that it was not her intention to be arrogant and antiauthoritarian if she behaved that way. In the letter she also forgave Mr. Bowles, Mr. Shassetz, and Ms. Martínez. Plaintiff wrote the letter

because she was going through a difficult situation.

50. Plaintiff was not evaluated during the year she was employed. There were at least two other people in the same status.

51. Plaintiff was given a training memo about sexual harassment in December 1998 and was aware that sexual harassment is not tolerated in the workplace.

52. On the first day at the agency, Mr. Bowles was explaining the duties of federal employees, like to report misconduct. Plaintiff denied stopping him and saying "I'm not going to be a chota" (snitch) nor did she say that she did not want to take part in that.

53. Referring to Exhibit B, the performance appraisal record assigned to her by Mr. Shassetz and Mr. Bowles, she noted the job elements critical to her evaluation during the probationary period. Only the signature was filled out. Nothing else was filled out. She was never evaluated. The progress review record provides for her rating. She received a copy of the performance plan.

54. In the November 12 memo, she relates what happened to her on October 28 in relation to Ms. Martínez' desk and that Ms. Martínez had given Ms. Crespo two different instructions.

55. Plaintiff testified that every time she deals with the case, filed in 2003, she gets depressed. She also referred to a personal situation from 2000 that causes her to get depressed. Once plaintiff was terminated, she stayed home. She felt very bad. She became depressed, cried and felt helpless, and felt that way for a long time. It took a long time to recover. She has her ups and downs. After she filed the complaint, every time she had to provide something, she was worse.

56. Plaintiff is now employed by FEMA and while she has a job, she can be placed on non-pay if there is no work. She began working for FEMA on September 9, 2005 and is now a GS–9, having started as a GS–5. She receives evaluations and her case work is monitored and assigned a value. She has a grade of almost 100 in the review of her cases.

57. The defense presented the testimony of Robert J. Bowles, a retired INS/CIS employee. (INS later became Citizens and Immigration Services under Homeland Security.) In 1998–99, he was the Assistant District Director of Examinations of INS, and previously performed duties as Program Manager for Examinations at the airport, as well as for inspections and naturalization. He held the first position for about 15 years. He has also been a Border Patrol officer for six years whence he came to San Juan where he completed 36½ years of service, close to 30 of which he was a supervisor.

58. Mr. Bowles met Ms. Crespo in 1998. She had applied as an examiner and was a newly arrived employee in his section when they met for the first time. Joseph Shassetz, Ms. Crespo's first line supervisor, was then absent for more than a week, and because of budget constraints and manning shortages, Mr. Bowles stepped into the duties of second line supervisor. He ex-

plained to her the duties of the job. Topics included the work of immigration examiner, what it entailed, and various visas that were applied for. Mr. Bowles presented a bird's eye view of what the office handled in relation to applicants, and those who contracted marriage for benefits under the law. Also discussed were the documents for applicants who sought visas for employment. Because the examiners were authorized to work overtime on Sundays, at night, at the airport, seaport and weekends, Ms. Crespo was told about the type of applicants she would encounter and related problems. His impression of her was that she was very attentive, concentrated on every word, and was no different from any other applicants during the first days of their job.

59. After plaintiff's third or fourth day on the job, he told her about the responsibility in the position where the employee must safeguard the integrity of the agency and keep an eye open for fraud and waste. She asked what that meant. He explained you get to know your fellow employees, and one day you find something funny happens between an attorney and a citizen applicant, you have the duty to report that to the proper authority, like to the Office of Internal Investigations. And she said, "You mean to tell me that I have to be a 'chota?'" (stoolie). She then put her hand up to him, moving forward, red-faced, and said she would not be a "chota". He found this disrespectful. He told her he would never tell her to be a "chota", that that is someone in the underworld. He told her that "we have to take out the bad apples", including any bad con-

duct that even himself might be guilty of. She continued to argue and said why doesn't the federal government hire someone to do that work. Then, Mr. Bowles told her to talk to her first line supervisor. He then left and she left. Later, Mr. Bowles called Mr. Shassetz in. He discussed the new employee and the incident, and other things that had occurred. Mr. Bowles said she was very strong, in demeanor, and exaggerated in what he talked about; to him, it did not make any sense.

60. Mr. Bowles has supervised many probationary employees, maybe 50, over his time as a supervisor, and knows the probationary rules which include those in the Code of Ethics pamphlet. He told the employees what was expected during the probationary year. They must successfully complete the Academy on the mainland, about a three-month course, return to home ports to continue on-the-job training, and are required to perform at levels assigned to each position. Upon successful completion, they would be promoted to next GS scale.

61. Ms. Crespo was terminated on February 23, 1999 because, in his opinion, and that of Mr. Shassetz, she failed to perform, and was insubordinate, and disrespectful toward her supervisors, Mr. Shassetz and himself.

62. Mr. Bowles recalled that Mr. Shassetz wrote a letter to Ms. Crespo related to an incident of insubordination in which Mr. Bowles was involved. All examiners were required to rotate into various clerical functions, to gain firsthand experience related to their official

duties as examiners. This included working with employment authorization documents, where applicants would come in for the EAD, and were to be adjudicated on the first day of filing. The work was very intense. However, there was a backlog because of the lack of sufficient employees. Ms. Crespo had been informed that overtime was a condition of employment. They, that is, management, would try so that employees did not have to work overtime as much as possible but if there was a workload, then they had to work overtime.

63 Plaintiff had said she did not like overtime and if she could avoid it she would. She was told that she had to work until the last applicant was served, and she was not authorized to depart for home. Plaintiff said she would go home and not work overtime, and Mr. Shassetz recorded the incident in a memorandum.

64. Ms. Crespo was assigned to the clerical unit where she was trained by Esperanza Martínez. Having been informed of the particular task at hand, and how it was done in an appropriate manner, Ms. Crespo refused to abide by her instructions because she was not Ms. Crespo's supervisor. Mr. Shassetz called Ms. Crespo and told her that Ms. Martinez was the expert in the matter regardless of her grade level. Ms. Crespo said that she did not have sufficient rank.

65. Based on Mr. Bowles' firsthand observation, and reports of Mr. Shassetz, he would become aware of employee conduct. Every time Mr. Shassetz counseled someone, he would show him a subject memorandum. In one particular incident, after her being told about the overtime, Ms. Crespo went home and Mr. Shassetz stayed since the applicants were left unattended.

66. There were 15,000 applications for naturalization, 10,000 visa applicants, and 5,000 employment authorization applications. The staffing levels were very constrained and there was a lot of pressure to the extent that quotas were assigned. There were seven DAOs and four or five clerks and that was not adequate. The supervisors had to come up with ways to improve productivity and not be too demanding on employees. As program manager, he was very intent on affording assistance to his subordinates when the demands from a higher level was too intense.

67. Mr. Bowles promoted the detection of fraud, and their numbers were high in terms of detecting it. Officers had personal problems and the supervisors tried to assist them.

68. There was a generally good relationship in the office, like a family type atmosphere, although sometimes the aliens were unruly, and sometimes there were confrontations between employees.

69. Mr. Bowles noted that in his affidavit dated October 29, 1999 (Exhibit 2), and later provided to the EEOC, that he did not relate the incident where Ms. Crespo raised her hand to him during her first week at the office. The affidavit does not mention anything about the tone of her voice, and did not say she was not comfortable. Nevertheless, Mr. Bowles was very concerned about her capacity to report fraud and he talked to Ms. Crespo about the Code of Ethics in

general terms. While her action was important, it was not mentioned at all in his affidavit, and only came to mind in the courtroom. He did not record the incident or issue anything in writing. He also felt that the incident did not disqualify her, although he reported the incident orally to her first line supervisor, for him to be aware. Whether to report the matter or not was discretionary on his part. He admitted there was nothing in the U.S. Department of Justice Ethics Handbook dated October 1994 (Exhibit 3) that required an employee to have to inform or report any (ethics) violations. After being terminated, Ms. Crespo filed a complaint at the EEOC. He then thought that the incident was relevant, and could not recall why he did not mention it at that level.

70. Mr. Bowles began working with INS in 1967 or 1968, and he gave Ms. Crespo guidance based on a document he received in 1967 and materials he got during his entire career.

71. Mr. Bowles noted that DAOs had badges, and that Ms. Crespo was required to be issued a badge and was issued credentials, although he did not recall if she was issued a badge.

72. Mr. Bowles considered Ms. Crespo's performance to be satisfactory, which is the same as fully successful, based upon his observations, which came from his daily rounds, and discussions with Mr. Shassetz. He felt Ms. Crespo had the potential to be an excellent employee with the passage of time. Mr. Bowles noted that she was very reluctant to work overtime and only worked when required. He admitted that Ms. Crespo might have worked overtime and not been paid, although he believed that she was paid. Unless there was compensation, employees were not required to work overtime. While the applicable regulation also provided for time off, like compensatory time, the district director did not want to approve compensatory time and felt that this would be subject to misuse by employees. He did not recall if he asked for volunteers but did recall that plaintiff never volunteered. Mr. Bowles could approve compensatory time if he went to the district director, but he never did. He was aware of employees who remained in the office after 5:00 P.M., although he himself went home at 5:00 P.M. every day.

73. Employees could volunteer for overtime. It was a condition of employment, and the supervisor could determine who worked overtime by alphabetical or numerical list of employees, where the supervisor would record the highest earners and put them at the bottom of the list and the lowest earners would be placed at the top of the overtime list. The top ones would have to take the call but they could get a replacement from an equal grade down to the bottom. There was an understanding that it was on a voluntary basis. However, if some task had to be completed, that could not be replaced, then it was required. The only person to make that determination was the first line supervisor, and in his absence the second line supervisor. So if final adjudications had to be completed, and there was a backlog, the supervisor would approach

the employee and tell him he had a backlog.

74. Mr. Bowles noted that employees were required to be evaluated during June or July of each year. This is the responsibility of the first line supervisor. The second line supervisor either approved the evaluation or provided comments. If the first line supervisor did not comply with the requirement, then the second line supervisor was responsible for complying with that duty. He had supervised many probationary employees, and noted that such evaluations were very important for both employer and employee, and it was also very important for performance to be within guidelines. Not evaluating an employee is contrary to the regulations. In his experience during the last 26 years, all employees were evaluated, although there were many failures in timely evaluations. Making reference to the Employee Handbook (Exhibit 4), and Form M62 INS DOJ referenced there, he noted that the document would apply to her. It was a performance evaluation, and a performance work plan.

75. Mr. Bowles did not concentrate on the elements of job description. He considered that new employees should be rotated from clerical positions, to areas of higher grades. That rotation was the responsibility of the first line supervisor, Mr. Shassetz, and rotations were done on a service-wide basis. Mr. Bowles had personal knowledge of Ms. Crespo's rotation. She was assigned to the EAD section, where Ms. Martínez was a supervisor. He did not know what percentage of that time she was performing clerical duties instead of DAO duties. The clerks relied heavily on the EADs. The clerks did not rotate into Adjudications because of their grades but the DAOs could fill the gaps in clerical, not on a 100% basis but as needed.

76. Mr. Bowles did not recall receiving any report from Mr. Shassetz on October 28, 1998, although he did require Mr. Shassetz to provide him with work-related complaints from employees. Mr. Bowles considered that at that time there were no issues that developed in relation to Ms. Crespo's duties in the EAD section that required Mr. Bowles to take action. Mr. Shassetz did mention Ms. Crespo being uncomfortable about bad jokes in the work environment, and Mr. Bowles asked Mr. Shassetz what the jokes consisted of. While Mr. Bowles did like a good joke, he did not like specific jokes, such as those with sexual connotations, or those against the dignity of humans, which are not in good taste. He also noted that this may be hard to determine since people bring their "baggage" with them. Mr. Shassetz told Mr. Bowles about the bad jokes that plaintiff rejected. Mr. Bowles did not believe that he had the need to take action, never interviewed Ms. Crespo, and did not ask Mr. Shassetz to write a memo. He did not immediately report it to his own supervisor and did not report it formally, in writing. The employees made jokes about circumstances of the applicants. Mr. Shassetz would relate the nature of the jokes to him. Mr. Bowles allowed jokes in the work environment but made sure the jokes did not disrupt other employees. Jokes could be heard in the

offices and in the cubicles but nobody complained to him about them.

77. Mr. Bowles recalled dancing with an employee and that there were other employees present. He did not think that any employee would find it offensive. An employee could report such an event to the EEOC or go to the person involved and say they resented the action, or to the person's supervisor or to the district director. They could go to Mr. Bowles and nobody did. He did not know if Ms. Crespo went to the EEO of the agency complaining about that. He did not notice any other employees react to this event.

78. Mr. Bowles noted that there were many employees, including DAOs, that he did not interview, such as Teresa González and Sally Ann Divornik.

79. Mr. Bowles told Ms. Crespo that he was a member of Marriage Encounter, and may have told her he was Catholic. He did not know what Ms. Crespo's religion was and nobody told him what her religion was. This occurred in the first two weeks of her working at the agency.

80. Making reference to Ms. Crespo's reply memo to Mr. Shassetz, he said that Mr. Shassetz did not provide him a copy of the memo. Mr. Shassetz explained to him the content of the memorandum, and Mr. Bowles took Mr. Shassetz's version to be the truth and did not ask plaintiff about her complaint against Mr. Shassetz, and did not hear plaintiff's version. Nor did Mr. Bowles investigate. He knew of the memo because of Ms. Peré and Mr. Shassetz and did not investigate beyond the conversation with Mr. Shassetz. In that memo, she was asking Mr. Shassetz to stop the bad treatment of her, to stop the improper pressure, referring to her as a rookie and arrogant, and making such comments in front of her co-workers. Her memo bypassed him in that she did follow proper channels.

81. Mr. Bowles testified that he did not have knowledge that she was going to file a complaint, but did admit that it was his understanding that she could possibly file a grievance with the union or the EEO. It was also Mr. Bowles' understanding at the time that Ms. Crespo was going to file a complaint against him and Mr. Shassetz, her supervisors, although he did not share his concerns of the complaints with Mr. Shassetz. He thought that there were labor issues, such as overtime, hours, and duties, but it never crossed his mind that there would be an EEOC issue. Mr. Bowles told Mr. Shassetz about his concerns regarding her attitude and her asking the employees how they allow their supervisors to climb over their backs like this. He had discussed it after Ms. Aguilar and Ms. Soto came to his office, and while Ms. Crespo was still in the service, before she was written up for dismissal.

82. Mr. Bowles recalled that in the majority of the situations where Mr. Shassetz had counseled Ms. Crespo, Mr. Bowles was present. Plaintiff was responding in the memo but it was not what he observed. She was responding to counseling in the office, like the times Ms. Shassetz counseled her on interpersonal relationships with

employees. She would burst out crying. He did not see any reason for that behavior from a mature employee.

83. Mr. Bowles noted that there were approximately seven times, or at least more than five, in which Mr. Shassetz counseled Ms. Crespo and he was present for at least part of the counseling session. He was definitely present on two occasions concerning overtime.

84. During his testimony, Mr. Bowles related his taking medication for memory problems, which was one of the reasons why he retired in 2004, burned out. He started having memory problems in 2000 and 2001. He left because he could retire and was sick. He had problems recollecting numbers and names, times and places, as well as key issues and points of law. Before he retired, he went to a psychiatrist. He is still having problems with numbers and dates and is not so secure in his knowledge and in his performance

85. Joseph Shassetz testified that he has been employed with INS since 1976, starting in San Antonio Texas. In 1980, he held the position of contact representative in Houston, and about 1984 he became a supervisory contact representative in New Orleans, where he remained for fourteen months. He then worked as a legalization officer in Houston in 1987. In 1990, also in Houston, he became an immigration examiner, and in 1996, he became a supervisory District Adjudication Officer in San Juan where he remained until December 1999. He then returned to Houston in the same position and has been there ever since. While in San Juan, he was second in command of the examinations program, his supervisor being Mr.Bowles. Mr. Shassetz was responsible for applications for permanent resident, and removal of conditions (referring to Form 751, remove conditions on who obtained green card by marriage). He was in charge of naturalization applications, and was a supervisor of the information sections and records section. He was a first line supervisor over the District Adjudication Officers and a second line supervisor for information and records, including oversight of the offices in St. Thomas and St. Croix.

86. His duties as first line supervisor of the DAOs was to assure their work was correct, particularly in their interviewing of applicants for immigration benefits. He supervised about 50 people, including Ms. Crespo, who was an adjudication officer. Ms. Crespo was selected to work at the San Juan Office by a hiring center operated by INS. He was not present when she reported to work and Mr. Bowles conducted her first orientation to the office, including telling her the duties she would be carrying out.

87. During the time Ms. Crespo was employed by INS, that he could recall, there were seven officers in adjudications: four males and three females. Of the three females, Ms. Crespo was the only one that did not pass her probationary period.

88. Mr. Shassetz noted that Ms. Crespo was very combative, and resistant to authority. While her attendance was regular and she was not abusive with her absences, her interaction with the employees was not very good. Her beliefs were

different. She seemed to carry herself aloof, and was abrasive. Employees did not get along with her. When there were issues between Ms. Crespo and another employee, he would normally find that the other employee was correct. She was not able to work along with her co-workers.

89. Mr. Shassetz felt that Ms. Crespo was difficult to work with. She was frustrated. Her face was upset/bothered, and was mocking toward him. She would be disagreeable and make no facial expression, or she would have her eyes up in the sky.

90. He recalled an incident of insubordination. Mr. Shassetz had given a memo to Ms. Crespo (Exhibit E) indicating the problems with her conduct, particularly two occurrences in which she had left the office leaving clients unattended. He asked and then told her to sign the memo. Ms. Crespo became very irate to the point that in an open area, she was very loud and persistent. Mr. Shassetz was telling her to sign the memo and that failure to sign it would be insubordination. He did not ask her for a response to the memo given to her. She was argumentative and would challenge his authority, and the examples in his memorandum of November 10 1997 illustrated his concerns. Referring to Exhibit E, and the handwritten note of Ms. Crespo, he noted that the tone of the note was resistant to authority. When he gave her the memo, he let Ms. Crespo read the original note, as well as a copy, in order to compare them. He was certain that she read both memos. He firmly ordered her at least three times to sign the memo. She did not want to sign it and refused. Carlos Muñoz was then present because Mr. Shassetz wanted a witness of her refusal. Both Mr. Shassetz and Ms. Crespo were tense and she was nervous. Mr. Shassetz found it both argumentative and insulting for her to write that note at the bottom of the memo. Because this was a counseling memo, there had to be proof that she was counseled, although there is no block on the memo for her to sign. The option is to give her the memo and have someone else witness his giving her the memo. When Mr. Shassetz was getting ready to leave, Carlos Muñoz, after telling her of the implications, told her, "You'd better sign it." She then signed it.

91. Mr. Shassetz received a long letter in response to this memo. (Exhibit A.) In her reply memo, he felt she refused to take responsibility in the various areas he asked her to improve, but rather gave her own opinions and resisted his guidance. Mr. Shassetz had had a meeting with Ms. Crespo and explained the issues and also explained the importance of correcting these issues. She complained about the matter in her reply memo, blaming things on her co-workers. She complained that he was unfair, and disagreed on work assigned to her. He noted that she had to get along with her superiors while she would say that it was always someone else's fault. He found her challenging and not cooperative, and found the tone of her response resistant to authority.

92. Mr. Shassetz noted that the overtime policy was that it was mandated. It had been voluntary at one time. Ms. Crespo's record of overtime was minuscule compared to

the others. In the examinations unit, some employees liked overtime and some did not. The majority liked to work overtime during the time Ms. Crespo worked there. While he did not know how much overtime plaintiff worked in 1998–1999, he knew it was very low. She worked some overtime, but he could not compare how much time she and others worked. The overtime pay depended on the pay grade. Most of the DAOs went up to a GS–12, so that one hour of over-time, time and a half, would be $40.13. A GS–12 would receive more than plaintiff. Some DAOs did not want overtime because it would put them in another tax bracket, although the majority liked to work overtime. The overtime was voluntary when funds were available.

93. Mr. Shassetz testified knowing about the EEO procedure, and that a person with a grievance can file a complaint, contacting the EEO local employee counselor within 60 days from when employee believed the discriminatory action happened. Many times the counselor resolves the matter at the local level. If not, the matter goes forward. Mr. Shassetz had been interviewed by an EEO investigator and told him that someone had brought to his attention that she was going to file an EEO complaint if she became permanent. Mr. Shassetz said it was a co-worker, and it occurred before she was terminated. Mr. Shassetz did not know when plaintiff filed an E.E.O. complaint.

94. Referring to the rotation system, Mr. Shassetz stated that working with the employment authorization documents was the most basic of the jobs. Once the officer worked with the petitions themselves, then they would go on to another area, such as Form 751s (removal of conditions). Ms. Crespo worked with the EADs a long time. The time she worked in clerical was comparatively short. She worked on the 751 removals and also work adjudications, applications for naturalization, and employment authorizations. She performed clerical functions, making and laminating the cards. If there were not enough clerks, then the DAOs would perform their work, although it was a lot of money for a GS–12 to do a GS–5's work.

95. As to the work environment, employees were under a lot of stress, because they had to complete a certain number of cases in adjudications. Notwithstanding the pressure, the mission could not stop. However, the environment was relaxed although they were required to complete a lot of work. There was a flexible, friendly atmosphere. Jokes were allowed. It was like a family, and Mr. Bowles was a very friendly boss.

96. Ms. Crespo's performance was that of a trainee and was not an issue. Her performance was fully successful. Her conduct was the issue.

97. Mr. Shassetz explained the evaluation process for probationary employees. The supervisor is sent a form to indicate if the applicant is performing favorable or unfavorably. The form is completed near the end of the probationary period. He noted that the evaluations are not always very timely, and did not remember receiving a form for her. Mr. Shassetz did not know when he evaluated Ms. Divornik and Ms.

González because at the end of the rating period, he had to turn in the evaluations. The rating period was one year. There were some times when he missed a mid-term evaluation of an employee. Referring to Exhibit B, he noted that plaintiff applied for a permanent position, GS–12, and had to go through a probationary period. He noted that the Performance Appraisal Record dated June 2, 1998 was signed by him but was not filled out. He termed this an oversight. At least one midterm evaluation is required which would be mid-way through the rating period. He failed to comply with the procedure of the mid-term evaluation although required to perform the evaluation. Mr. Shassetz admitted to being negligent in this regard.

98. Mr. Shassetz discussed the duties of a duty officer. A clerk could not be assigned that task because he could not make a determination. The duty officer could issue a card, adjudicate a 751, and an N400 (application for naturalization), if time allowed. Mr. Shassetz assigned Ms. Crespo as duty officer from time to time. Ms. Crespo was assigned because perhaps somebody was missing, or there was a shortage of staff. Sometimes the duty officers had extra duties and sometimes they did not. That is, she could be assigned the task of duty officer with other duties.

99. Referring to a day when applicants were left unattended, and plaintiff had been sick for three days and under medication, Mr. Shassetz made the decision to send the applicants home and did not recall if he ordered Ms. Crespo to attend to them.

100. Ms. Crespo was terminated in 1999. Mr. Shassetz was told to give her the order of termination and he did so. He said there was a problem with the various conduct issues and that they had been listed in the letter of termination.

## CONCLUSIONS OF LAW

This court has jurisdiction over the subject matter under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

### Hostile Work Environment

 Title VII of the Civil Rights Act of 1964, as amended, makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] ... terms, conditions, or privileges of employment, because of such individual's ... sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent ' "to strike at the entire spectrum of disparate treatment of men and women" ' in employment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citations omitted). This "extends to sex-based discrimination that creates a hostile or abusive work environment." *Billings v. Town of Grafton,* 515 F.3d 39, 47 (1st Cir.2008) (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. at 66, 106 S.Ct. 2399). Title VII is violated when the workplace is permeated with discriminatory behavior that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive environment. *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. at 65 & 67, 106 S.Ct. 2399).

[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These

may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris v. Forklift Sys. Inc.*, 510 U.S. at 23, 114 S.Ct. 367, *cited in Billings v. Town of Grafton*, 515 F.3d at 48; *Cardona v. Potter*, 536 F.Supp.2d 172, 178 (D.P.R.2008); *Rigau v. Pfizer Caribbean Corp.*, 525 F.Supp.2d 272, 283 (D.P.R.2007).

Plaintiff testified about the incidents concerning El Bonbón de la Semana, the No Te Duermas Show, the initial meeting with Mr. Bowles, and the general familiarity, including touching, that permeated the office workplace. This included improper jokes and conversations about sexuality. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. at 67, 106 S.Ct. 2399 (hostile environment claim not actionable unless harassment "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment' ") (citation omitted).

■ It is an unlawful employment practice under Title VII for an employer to require an employee "to work in a discriminatorily hostile or abusive environment." *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 394 (1st Cir.2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21, 114 S.Ct. 367). "A hostile work environment exists in violation of Title VII '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir.2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21, 114 S.Ct. 367). Since there is no "mathematically precise test" to determine whether enough evidence has been presented for a hostile

environment claim, *Harris v. Forklift Sys., Inc.*, 510 U.S. at 22, 114 S.Ct. 367, the court must look at " 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; ... and whether it unreasonably interfer[ed] with [plaintiff's] work performance.' " *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (quoting *id.* at 23).

■■ As noted, in a hostile work environment claim, the conduct complained of has to be severe or pervasive so as to alter the terms and conditions of employment of a Title VII plaintiff. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). To be actionable under Title VII, the "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21–22, 114 S.Ct. 367). A mere offensive utterance is not enough to create a hostile environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21, 114 S.Ct. 367. Similarly, " 'simple teasing,' offhand comments, and isolated incidents ... will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. at 788, 118 S.Ct. 2275 (internal quotation omitted). To succeed in a hostile work environment claim, a plaintiff must prove,

(1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment

and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir.2001) (citations omitted). Because the accumulated effects of incidents over time can amount to a hostile work environment, the allegations of harassment must be considered collectively. *Id.* at 729.

■ In this case, a review of the evidence presented at trial points to the conclusion that plaintiff has failed to present sufficient evidence to establish the existence of a hostile work environment. Plaintiff testified that on several occasions, Mr. Bowles made improper comments that bothered her although she also said that he never crossed the line. She never told him to stop any comments. *Cf. White v. N.H. Dep't of Corr.,* 221 F.3d 254, 261–62 (1st Cir.2000). Her first complaint in relation to his offensive conduct was not made until April 1999.

Plaintiff found these comments subjectively objectionable and offensive as evidenced by her testimony. She did not welcome the comments and they made her feel uncomfortable. Nevertheless, testimony and other evidence presented at trial reflects that such offensive comments were infrequently made by Mr. Bowles. While conversations and comments might have been offensive, they were not harassing in an objective manner and may hardly be characterized as harassing in a subjective manner. *See, e.g., Rigau v. Pfizer Caribbean Corp.,* 525 F.Supp.2d at 283–84. Plaintiff testified that the comments were inappropriate basically because she did not like them. Objectively, however, these comments cannot be characterized as sub-

jecting plaintiff to an environment severe and pervasive enough as to have altered the terms and conditions of her employment. *See, e.g., Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68–69, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Mr. Bowles, using a picture not shown to plaintiff, described a married couple seeking citizenship having intercourse, using a suggestive gesticulation. While it might have offended plaintiff, and the method was lacking in decorum, the context of Mr. Bowles actions was work-oriented. He danced briefly, perhaps seconds but less than a minute, with a co-employee. This dancing was at best an episode or isolated event since it appears not to have been repeated. Nothing in the evidence enables the court to determine that any comments were physically threatening or that they unreasonably interfered with plaintiff's work performance. In relation to the centerfold displays and discussions regarding a television program, not only did she continue to perform her duties in a satisfactory, or fully successful fashion, even according to the supervisors, but the conduct was either curtailed or ignored by plaintiff, so that if she walked away or chose not to participate in the conversation, the matter ended there. This included not only the episodes concerning El Bonbón de la Semana and No Te Duermas, but the bad jokes, familiarity, presumptuousness, and touching. Except for the Bonbón incidents, aside from a familiar atmosphere which appeared to be welcomed by the employees, no discriminatory conduct was directed toward plaintiff or conducted for the purpose of affecting her. The Bonbón pictures did not appear to be so egregious that other people, including the female employees, found them offensive. *Cf. Lipsett v. U.P.R.,* 864 F.2d 881, 888 (1st Cir.1988). Plaintiff assumed that they knew from her reaction that the conduct was unacceptable. She never reported the posted Bon-

bón pictures to anyone. She never told the offenders to take them down and never told them the pictures were offensive. *See Ortiz v. Hyatt Regency Cerromar Beach Hotel, Inc.,* 422 F.Supp.2d 336, 342 (D.P.R. 2006). She was never touched and I cannot infer from the evidence presented at trial that any intentional or unintentional derisive comments were directed toward her. *See, e.g., Fontánez–Núñez v. Janssen Ortho LLC,* 447 F.3d 50, 57 (1st Cir. 2006); *Valentín–Almeyda v. Municipality of Aguadilla,* 447 F.3d 85, 94 (1st Cir. 2006). She never reported any offending conduct to anyone until October 28, 1997, as reflected in her reply November 12 memorandum and did not tell any offending co-workers that they were crossing the line or being offensive in any way. In that particular memo addressed to Mr. Shassetz, she did not mention or infer sex discrimination, nor did she make any reference to or inference related to a hostile work environment, but rather complained to Mr. Shassetz as follows: "I want you to stop the improper pressure on me, and to stop treating me with disrespect, saying to me words like "rookie" and "arrogant", and to stop making comments about my performance in front of my co-workers, violating my privacy and dignity. I want you to, as my supervisor, help me in the learning of my job, and to give me the amount of work that is expected to be completed by a GS–5 trainee, instead of the work expected from a GS–12 journeyman." (Exhibit A, ¶ 5.) The mention of her GS–5 trainee status might trigger thoughts of a possible grievance but not discrimination due to sex. *See, e.g., Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 777 (6th Cir.1996); *Juárez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 321 (7th Cir.1992).

Notwithstanding that there was no actual evaluation, Mr. Bowles and Mr. Shassetz agreed that plaintiff's performance was satisfactory during the time she worked at INS. That she was able to perform her job satisfactorily does not lessen her complaint that she believed she worked in a hostile work environment, and it is not my intention to penalize her for a fully successful performance. *See Billings v. Town of Grafton,* 515 F.3d at 51. The comments made by Mr. Bowles or Mr. Shassetz appear to be offhand, isolated in scope, and do not reach the level of even teasing. Such comments might be considered merely offensive at best. Thus, in weighing the evidence, I conclude that plaintiff has not prevailed in her hostile work environment cause of action. "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins." *Marrero v. Goya of P.R., Inc.,* 304 F.3d 7, 19 (1st Cir.2002) (quoting *Suárez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 54 (1st Cir.2000)). Title VII is not a general code of civility, thus, the standard for a hostile work environment is sufficiently demanding so as to permit the court to filter out complaints relating to the ordinary tribulations of the workplace. *Crespo v. Schering Plough del Caribe, Inc.,* 231 F.Supp.2d 420, 427–28 (D.P.R.2002) (citations omitted); *see also Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Indeed, men and women in the division were exposed to the Bonbón pictures and No Te Duermas conversations as well as co-workers from other divisions, none of which appear to have been offended. Finally, plaintiff has not demonstrated that hostile conduct "was directed at [her] because of a characteristic protected by a federal anti-discrimination statute." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. at 80, *cited in Quiles–Quiles v. Henderson,* 439 F.3d 1, 7–8 (1st Cir.2006); *cf. Valentín–Almeyda v. Municipality of Aguadilla,* 447 F.3d at 89–90.

### Gender–Based Discrimination

■ Plaintiff further alleges that she was treated differently from similarly situated individuals outside of her protected group. In order for plaintiff Crespo to prevail in a disparate treatment Title VII action, she must produce evidence according to the now-familiar framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Thus, plaintiff Crespo bears the initial burden of establishing a *prima facie* case of sex discrimination. Once the court concludes that the plaintiff has proved a *prima facie* case of disparate treatment, then the court must consider the defendant's justification for the alleged discriminatory action. In other words, "[t]he defendant must meet a burden of production by articulating a legitimate, nondiscriminatory reason for its challenged actions[.]" *Fields v. Clark Univ.,* 966 F.2d 49, 51 (1st Cir.1992) (citations omitted). Thereafter, the plaintiff has "an opportunity to prove by a preponderance of the evidence that the defendant's proffered reason was merely a pretext for discrimination." *Id.* at 51–52; *Fontánez–Núñez v. Janssen Ortho LLC,* 447 F.3d at 56–57.

■ The evidence presented in relation to gender-based discrimination does not preponderate toward a finding for plaintiff. *Lee–Crespo v. Schering–Plough Del Caribe Inc.,* 354 F.3d 34, 47 (1st Cir.2003). The defendant has presented evidence of valid, non-pretextual, non-discriminatory reasons for plaintiff's discharge. Plaintiff has placed in controversy some of the mentioned incidents and her interpretation varies from the interpretations given by Mr. Bowles or Mr. Shassetz. Plaintiff's lengthy response of November 12, 2008 is both a protest and a demand for certain conduct on the part of her supervisors, which demands assume that her supervisors are harassing her. Rather than just constitute a response to a counseling memo, the November 12 memo is more a demand which chills the supervisors' ability to counsel employees when he or she is made aware of some shortcoming, whether the supervisor is ultimately right or wrong. Clearly, and notwithstanding plaintiff's satisfactory performance in general, the written notation on the November 10 memo would lend weight to the decision to terminate plaintiff, together with other incidents, such as the refusal to work overtime when required, her twice having walked out at quitting time without authorization, although she was needed, the refusal to be willing to blow the whistle on misconduct, her leaving of the workplace with two customers still waiting for services, the failure to take instructions from Esperanza Martínez because she did not have enough rank and was not plaintiff's supervisor, a perceived confrontational attitude to counseling, the manner in which she refused to sign a counseling letter as evidence of its receipt. Even the distrust of the supervisor giving her the counseling memo would easily add to the list of articulated reasons to discharge a probationary employee.

Plaintiff argues that the gender-based discrimination is apparent from the assignment of duties. However, there is no evidence that males were required to do any less than she was and while the women were paid less and performing the same work as men getting paid much more, that phenomenon appears to be caused by seniority and not by nefarious intent. It appears that there was not a great turnover of personnel. The GS–5 positions appeared to be entry level and it also appears that three District Adjudications Officers were hired in a year, Teresa González, Sally Ann Divornik and plaintiff. The male officers had been employed there many years. No evidence has been presented that other women in her category

did not suffer the same fate being given work that was difficult for them to complete because of their neophyte status. It is uncontroverted that the division's resources were stressed because of the number of applicants and shortage of personnel.

Plaintiff was not evaluated. There was no evidence to show that other similarly situated employees were evaluated. Plaintiff herself was not aware of any male employees who got their 1998 evaluations on time nor was she aware of similarly situated male employees who were treated more favorably than she. The evaluation process lacked a degree of order and was admittedly lacking, lacking uniformly rather than by design. As a result of admitted negligence, Mr. Shassetz failed to conduct a mid-term evaluation of plaintiff as well as of others. This failure does not trigger the belief that it was intentional. In any event, hints of skullduggery are defused by the admission of Mr. Bowles and Mr. Shassetz that plaintiff's performance was satisfactory or fully successful. Were the complaints based on plaintiff's performance, and not conduct, then plaintiff's position would have greater weight. However, that is not the case.

Finally, the atmosphere at the agency was not so intolerable that a reasonable person would find it pervasively oppressive. In general, people were familiar at the agency and discussed personal matters. Of the people who were familiar with each other in the workplace, there were at least four women, including Ms. González and Ms. Divornik. Almost everyone in the division interacted with familiarity. That can hardly be described as oppressive or hostile. The incidents that plaintiff complained about during the trial were episodes for the most part, and plaintiff either did not participate in them or ignored them. Indeed, she put no one on notice that she found certain things in the workplace offensive and left the correction of offensive conduct to her assumptions. She went for six months without experiencing an improper joke or any degree of familiarity from her fellow workers. No one purposefully offended plaintiff notwithstanding her conclusion. *See, e.g., Thompson v. Coca–Cola Co.*, 522 F.3d 168, 180 (1st Cir.2008). And while there appeared to be an inordinate amount of touching among the employees and supervisors, there is not one incident of improper touching related during the trial.

In short, the evidence does not gravitate toward a finding that plaintiff suffered gender-based discrimination in her employment.

## Retaliatory Discharge

■ In order "[t]o establish a claim of retaliatory discharge under Title VII, [plaintiff] must show by a preponderance of the evidence that: (1) she engaged in a protected activity as an employee, (2) she was subsequently discharged from employment, and (3) there was a causal connection between the protected activity and the discharge." *Hoeppner v. Crotched Mountain Rehabilitation Ctr., Inc.*, 31 F.3d 9, 14 (1st Cir.1994) (citing *Ramos v. Roche Prods., Inc.*, 936 F.2d 43, 48 (1st Cir. 1991)); *see also Mariani–Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 223 (1st Cir.2007); *White v. N.H. Dep't of Corr.*, 221 F.3d at 262; *Hazel v. U.S. Postmaster Gen.*, 7 F.3d 1, 3 (1st Cir.1993).

■ Title 42 U.S.C. § 2000e–3(a), provides in relevant part that

[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this sub-chapter.

42 U.S.C. § 2000e–3(a); *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 59, 126 S.Ct. 2405. To prove a claim for retaliation, Ms. Crespo must prove that: "(1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Calero–Cerezo v. United States Dep't of Justice*, 355 F.3d 6, 25 (1st Cir.2004) (citing *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir.2002)). Once a *prima facie* case of retaliation is established, the *McDonnell Douglas* burden-shifting approach is employed. Again, the defendant has to articulate a legitimate non-discriminatory reason for the employment decision. The plaintiff then has to show pretext and retaliatory animus. *Calero–Cerezo v. United States Dep't of Justice*, 355 F.3d at 26.

■ Plaintiff Crespo has proven the first of the three requirements for retaliatory discharge. She engaged in protected conduct, that is, the filing of an EEOC complaint but this occurred after she was terminated. However she also alleges that her memo of November 12 responding to the November 10 memo she received was protected activity which triggered the reprisal of her termination. In its broadest sense, the letter may be considered protected activity and also contains part of the reasoning for the discharge according to Mr. Bowles. *Cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 67–70, 126 S.Ct. 2405. With this in mind the defense needed to then prove that it had legitimate non-discriminatory reasons for discharging plaintiff. While such reasons need not be fair or accurate, they cannot be a pretext for discrimination and must be legitimate. *See, e.g., Bennett v. Saint–Gobain Corp.*, 507 F.3d 23, 31 (1st Cir.2007). In plaintiff's letter, she directed management to stop the improper pressure on her.

■ In the November 12, 1982 memo, there is no mention or inference of discrimination of sorts. Nor does it contain any inference of a hostile work environment, sexual harassment, nor gender discrimination. There is no mention of any EEO process, nor of her mention of intending to file a complaint. Indeed, any such mention is made after termination. The three months that passed between the allegedly protected activity, November 12, 1987, and the discharge, February 23, 1999, certainly provides a *prima facie* case of retaliation. *See, e.g., Mariani–Colón v. Dep't of Homeland Sec.*, 511 F.3d at 224. However, her 1997 complaint may be described as a labor-management grievance-oriented rather than a Title VII triggering mechanism related to discrimination. Thus, her complaint was not a protected activity. *See, e.g., Freadman v. Metro. Property & Cas. Ins. Co.*, 484 F.3d 91, 99 (1st Cir.2007).

■ The evidence does not preponderate toward a finding that there is probably a nexus between plaintiff's protected conduct and plaintiff's discharge. The fact that members of management knew she had made a complaint and that a member of management would say, "That sunk you!" in relation to the letter plaintiff wrote dated November 12, 1998 is insufficient to create such a causal nexus when compared to the other evidence of record, particularly Exhibits A and E. That Mr. Shassetz was told by a fellow worker that plaintiff would file a complaint once she became permanent is also insufficient to provide a causal nexus between that statement and plaintiff's termination. *See, e.g., González v. El Día, Inc.*, 304 F.3d 63, 69 (1st Cir.2002). The trial record supports my finding that plaintiff was discharged not for exercising a protected right but for her abrasive, insubordinate conduct, not-

withstanding her satisfactory work performance.

Therefore I find that plaintiff was not discharged in retaliation for her engaging in protected conduct.

## CONCLUSION

"There is no mathematically precise test used to determine whether a plaintiff has demonstrated sufficiently severe or pervasive harassment." *Figueroa García v. Lilly del Caribe, Inc.,* 490 F.Supp.2d 193, 204 (D.P.R.2007); *San Miguel v. Nesco Redondo, S.E.,* 394 F.Supp.2d. 416, 425 (D.P.R. 2005). Determining what is retaliatory or non-pretextual conduct is equally challenging. Plaintiff has presented testimony to show that she was the victim of gender-based discrimination, of a hostile work environment, and of retaliation for engaging in a protected activity, resulting in her termination from employment with the Immigration and Naturalization Service on February 23, 1999. She has also presented evidence to show she was treated differently from similarly-situated individuals outside of her protected group. I find that evidence to be insufficient to carry her burden of persuasion. While the evidence shows that her performance was fully successful, her conduct, as reasonably perceived by her supervisors, was abrasive, her attitude insubordinate, and her reaction to counseling insulting. Also, there was no nexus between her possibly threatening to file a complaint after her probationary period expired and her having been discharged. Whether mistaken or well-founded, good-faith, non-discriminatory, non-pretextual reasons for her discharge have been presented to show that the defendant did not violate the provisions of Title VII and did not otherwise engage in discrimination based upon plaintiff's sex, or her exercising her right to protected conduct. *See, e.g., Ronda Pérez v. Banco Bilbao Vizcaya Argentaria,* 404 F.3d 42, 45 (1st Cir.2005); *cf. Mesnick v.* *Gen. Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991).

The religion-based claim was previously dismissed at the close of plaintiff's case.

In view of the above, I find for the defendant and dismiss the complaint in its entirety. The Clerk is directed to enter judgment accordingly.